UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STATE OF MICHIGAN,

    Plaintiff,

v.

BRIAN WILLIAM KEELY,

    Defendant.
_____/

Case No. 1:24-cv-672

Hon. Hala Y. Jarbou

## **OPINION**

Defendant Brian Keely was a detective sergeant with the Michigan State Police ("MSP") assigned to a regional task force created by the United States Marshal Services ("USMS"). On April 17, 2024, Keely and other members of that task force were attempting to apprehend Samuel Da Jon Cornelius Sterling under multiple warrants for his arrest. As Sterling fled on foot, Keely pursued him in his vehicle. While Sterling was running along the exterior wall of a Burger King restaurant, Keely drove his vehicle toward Sterling in order to block his escape. The vehicle struck Sterling and pinned him against the brick wall. Sterling died from his injuries.

In May 2024, the Michigan Attorney General filed a felony complaint against Keely in state court, charging him with second-degree murder and involuntary manslaughter for the death of Sterling. (Felony Compl., ECF No. 1-1, PageID.28.) Keely seeks to remove those proceedings against him to this Court under the federal officer removal statute, 28 U.S.C. § 1442. For the reasons herein, the Court finds that removal is permissible.

# I. PROCEDURAL HISTORY

### A. State Court Proceedings

Keely appeared before the state court on June 5, 2024. (Recall of Warrant, ECF No. 1-1, PageID.32.) That court initially ordered him to appear for a "probable cause hearing" and preliminary examination on June 24, 2024. (Notices to Appear, ECF No. 1-1, PageID.55-56.) The state court subsequently revised its schedule and ordered him to appear for a "Probable Cause Hearing" set for July 1, 2024, with a preliminary examination set for August 12, 2024. (Notices to Appear, ECF No. 1-1, PageID.38-39.)

### B. Notice of Removal

Keely filed a notice of removal in this Court on June 28, 2024, under 28 U.S.C. § 1442. The latter provides, in relevant part:

> (a) A . . . criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
>> (1) The United States . . . or *any officer* (*or any person acting under that officer*) *of the United States* or of any agency thereof, in an official or individual capacity, *for or relating to any act under color of such office* or *on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals* or the collection of the revenue.
>
> . . .
>
> (c) Solely for purposes of determining the propriety of removal under subsection (a), a law enforcement officer, who is the defendant in a criminal prosecution, shall be *deemed* to have been acting under the color of his office if the officer--
>
>> (1) protected an individual in the presence of the officer from a crime of violence;
>>
>> (2) provided immediate assistance to an individual who suffered, or who was threatened with, bodily harm; or
>>
>> (3) prevented the escape of any individual who the officer reasonably believed to have committed, or was about to commit, in the presence of the

>> officer, a crime of violence that resulted in, or was likely to result in, death or serious bodily injury.

28 U.S.C. § 144 (emphasis added).

The general procedure for removing criminal prosecutions is set forth in 28 U.S.C. § 1455, which provides as follows:

> (a) Notice of removal.--A defendant or defendants desiring to remove any criminal prosecution from a State court shall file in the district court of the United States for the district and division within which such prosecution is pending a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action.
>
> (b) Requirements.--(1) A notice of removal of a criminal prosecution shall be filed not later than 30 days after the arraignment in the State court, or at any time before trial, whichever is earlier, except that for good cause shown the United States district court may enter an order granting the defendant or defendants leave to file the notice at a later time.
>
> (2) A notice of removal of a criminal prosecution shall include all grounds for such removal. . . .
>
> (3) The filing of a notice of removal of a criminal prosecution shall not prevent the State court in which such prosecution is pending from proceeding further, except that a judgment of conviction shall not be entered unless the prosecution is first remanded.
>
> (4) The United States district court in which such notice is filed shall examine the notice promptly. If it clearly appears on the face of the notice and any exhibits annexed thereto that removal should not be permitted, the court shall make an order for summary remand.
>
> (5) *If the United States district court does not order the summary remand of such prosecution, it shall order an evidentiary hearing to be held promptly and, after such hearing, shall make such disposition of the prosecution as justice shall require.* If the United States district court determines that removal shall be permitted, it shall so notify the State court in which prosecution is pending, which shall proceed no further.

28 U.S.C. § 1455 (emphasis added).

The Court reviewed the notice of removal in accordance with § 1455(b)(4) and determined that it does not "clearly appear" that removal should not be permitted. Consequently, the Court held an evidentiary hearing on August 21, 2024, in accordance with § 1455(b)(5).

### C. Evidentiary Hearing

At the hearing, the Court heard testimony from Supervisory Deputy U.S. Marshal Matthew Ortiz, Detective Sergeant Ross Eagan of the Wyoming Department of Public Safety, and Officer Jeffrey Woollam of the City of Kentwood Police Department. The Court also received the following documents into evidence: a sworn declaration by Ortiz (Def.'s Ex. 1; *see* Ortiz Decl., ECF No. 11-1); a 2018 Memorandum of Understanding ("2018 MOU") between the USMS and the MSP 6th District (Def.'s Ex. 2); a Special Deputation Oath of Office, Authorization and Appointment, signed by Keely in December 2023 (Def.'s Ex. 3; *see* Special Deputation Oath of Office, ECF No. 10-2); and an "Enforcement Action Briefing" regarding Sterling (Def.'s Ex. 4).

The Court must now determine whether removal is permitted. *See* 28 U.S.C. § 1455(b)(5).

## II. STANDARD

To remove under § 1442, Keely must establish the following: (1) he was a federal officer or acted under a federal officer; (2) the prosecution is for acts performed "under color of [federal] office"; and (3) he has a "colorable federal defense." *See Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999). "[A]ll doubts should be resolved against removal." *Mays v. City of Flint*, 871 F.3d 437, 442 (6th Cir. 2017) (quoting *Harnden v. Jayco, Inc.*, 496 F.3d 579, 581 (6th Cir. 2007)).

## III. ANALYSIS

### A. Factual Findings

The Court makes the following findings based on the evidence presented. In April 2024, Defendant Keely was a Detective Sergeant employed by the MSP. He worked full time for a task force created by the USMS under the authority given to it in 28 U.S.C. § 566 and 34 U.S.C.

4

§ 41503. Section 566 authorizes the USMS to "investigate such fugitive matters, both within and outside the United States, as directed by the Attorney General." 28 U.S.C. § 566(e)(1)(B). In 2000, Congress required the USMS to establish permanent regional task forces to apprehend fugitives. *See* Presidential Threat Protection Act of 2000, Pub. L. No. 106-544, 114 Stat. 2715, 2718-19; 34 U.S.C. § 41503(a) (providing for the establishment of "permanent Fugitive Apprehension Task Forces consisting of Federal, State, and local law enforcement authorities in designated regions of the United States, to be directed and coordinated by the United States Marshals Service, for the purpose of locating and apprehending fugitives," including state fugitives).

Relevant here, the USMS created a regional task force operating out of Grand Rapids, Michigan. The 2018 MOU (which was in effect in April 2024) set forth terms and conditions whereby the USMS task force would cooperate with the MSP and whereby MSP officers could work for the task force. The stated mission of the task force is to "investigate and arrest, as part of joint law enforcement operations, persons who have active state and federal warrants for their arrest." (2018 MOU 1.) The task force prioritizes warrants for individuals charged with "violent crimes against persons, weapons offenses, [and] felony drug offenses" as well as individuals who have a criminal history of violent crimes.[1] (*Id.*)

State police officers assigned to the task force must be approved by the USMS and subjected to background investigation before they can receive "unescorted access to USMS offices, records, and computer systems." (*Id.* at 2.) The 2018 MOU also allows USMS to acquire vehicles and equipment for use by state and local officers assigned to the task force. (*Id.*)

---

[1] Sterling apparently fit this profile. He appears to have had warrants for carrying a concealed weapon, domestic violence, felon in possession of a firearm, violating the terms of his probation, and larceny from a person, among others. (*See* Police Rep., ECF No. 10-5.)

Ownership of the vehicles remains with the USMS, and the vehicles must be used "solely in support" of task force operations. (*Id.*)

As a member of this federal task force, Keely was not employed by the USMS or the federal government. His employer was the MSP, which paid for his salary and benefits. However, the USMS conferred on him a special title and authority. He took an oath of office and the USMS appointed him as a "Special Deputy U.S. Marshal" authorized to "seek and execute arrest and search warrants supporting a federal [task force] under Title 18 authority." (Special Deputation Oath of Office.) That deputation allowed him to work outside his usual jurisdiction as a MSP officer, including outside the state. In addition, the USMS gave him legal and tactical training, an unmarked USMS vehicle, access to a federal information database, and access to communications frequencies reserved for USMS officers. During task force operations, Keely was under the supervision of a Deputy U.S. Marshal.

State officials brought Sterling's case to the attention of the USMS task force. Detective Sergeant Eagan supervises a local task force—known as the "Metro pattern crimes team" or "MPACT"—consisting of detectives from the Wyoming, Kentwood, and Kent County sheriff's offices. In January 2024, MPACT attempted to locate Sterling in order to arrest him. Kentwood police had attempted to arrest Sterling but they were unsuccessful because he fled from them. MPACT used various methods of surveillance to determine Sterling's location. In early April, they were able to locate him and set about making plans to apprehend him on April 17. Due to the safety risks involved in apprehending Sterling because of his violent history and propensity to flee, Eagan determined that MPACT needed the resources and expertise of the USMS task force. A member of his team, Officer Woollam, contacted the USMS task force to see if it would accept

6

Sterling's case and apprehend him. The USMS task force accepted Sterling's arrest warrant(s) and agreed to apprehend him.

On the morning of April 17, Woollam briefed members of MPACT and the USMS task force on an "operations plan," which was a document detailing Sterling's address, criminal history, appearance, and vehicle information. The officers present also discussed a general plan to arrest Sterling: some officers would try to get Sterling into the open and then whichever officers were in the best position to make the arrest would do so. Within an hour or two after that briefing, officers from both task forces arrived at the location where they planned to make the arrest.

Although MPACT and the USMS task force worked together to apprehend Sterling, they had different command structures. Eagan supervised the MPACT team; neither he nor MPACT had any authority over the USMS task force, which was supervised by Deputy U.S. Marshal Fernandez. Fernandez was present during the attempted arrest of Sterling.

When Keely attempted to apprehend Sterling, he did so in his capacity as a Special Deputy U.S. Marshal and member of the USMS task force. He was using the equipment and vehicle provided by USMS and he was under the command and supervision of Fernandez. Put another way, he was present at the scene only because he was part of the USMS task force. He was not there as an MSP officer who happened to take part in an attempted arrest while performing the regular duties of an MSP officer.

### B. Application of Facts

Based on the facts above, Keely has satisfied the requirements for removal.

#### 1. Federal Officer or Acting Under Federal Officer

*Federal Officer.* Although Keely was employed by the MSP, the USMS appointed him as a Special Deputy U.S. Marshal with authority to execute warrants accepted by the USMS task

7

force. He was exercising that authority at the time of Sterling's death, which makes him a federal officer for purposes of the removal statute.

Plaintiff argues that Keely was not a federal officer because he could not perform *all* the duties of a Deputy U.S. Marshal and he was not a federal employee. Section 1442 does not define "officer," but the general federal definitions statute defines that term as "any person authorized by law to perform the duties of the office[.]" 1 U.S.C. § 1. That definition fits here. "When state and local law enforcement officers participate in [USMS] task forces, they are deputized and perform the functions of deputy marshals." *Robinson v. Sauls*, 102 F.4th 1337, 1345 (11th Cir. 2024) (citing 28 C.F.R. § 0.112(b)). Keely was performing the duties of his special federal office during the incident at issue because he was attempting to execute a warrant for Sterling's arrest. Plaintiff cites no authority requiring that an individual possess the authority to perform *all* the duties of a federal office in order to qualify as a federal officer under the removal statute. Indeed, as Plaintiff acknowledges, the terms "federal officer" and "federal employee" are not synonymous. (Pls.' Resp. Br. 9, ECF No. 10.)

Furthermore, the "basic" purpose of the removal statute is to protect the federal government from interference by states with the actions of its "officers and agents" acting "within the scope of their authority." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007) (quoting *Willingham v. Morgan*, 395 U.S. 402, 406 (1969)). That purpose would not be well served by withholding protection from officials like Keely, who are not employees of the federal government but to whom that government has given specific authority and resources to act in furtherance of the government's objectives. In fact, other courts have held in similar circumstances that state officials specially deputized as federal officials qualify as federal officers under the removal statute. *See, e.g.*, *Texas v. Kleinert*, 855 F.3d 305, 312 (5th Cir. 2017) (holding that a state official specially

8

deputized as a federal agent who investigated federal crimes on a full time basis for an FBI task force, received a federal security clearance, and used federally-issued equipment was a federal officer); *Ohio v. Meade*, No. 2:21-cv-5587, 2022 WL 486294, at *3 (S.D. Ohio Feb. 17, 2022) (holding that a state official who worked full time for a USMS task force, "used a USMS-issued vehicle and tactical vest for his job duties, and reported to a USMS supervisor" was a federal officer).

Keely is like the officials in *Meade* and *Kleinert*. He worked full time for a federally-created entity (the USMS task force), he received federal training, he used federally-issued equipment to perform his work, he received special access to a federal database, and when pursuing fugitives like Sterling, he acted within the scope of his federal authority while under the command and supervision of a federal officer. These circumstances make him a federal officer for purposes of the removal statute.

*Acting Under a Federal Officer.* Even if Keely's special deputation did not make him a federal officer, Keely was "acting under a federal officer" when attempting to apprehend Sterling. "The words 'acting under' are broad, and the [Supreme Court] has made clear that the [removal statute] must be 'liberally construed.'" *Watson*, 551 U.S. at 147. An "acting under" relationship "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal *superior*." *Watson*, 551 U.S. at 152. "*Watson* interprets 'acting under' to mean that the defendant seeking removal must be in a relationship with the federal government where the government is functioning as the defendant's superior." *Mays v. City of Flint*, 871 F.3d 437, 444 (6th Cir. 2017).

As indicated, all USMS task force members (including Keely) were under the direction, control, and supervision of the USMS. In particular, when attempting to arrest Sterling, Keely

9

was under the supervision of Deputy U.S. Marshal Fernandez. Thus, Keely was acting under a federal superior.

Plaintiff argues that the operation to arrest Sterling was, at most, a joint effort initiated by state officials who developed a plan to arrest Sterling and then sought assistance from the USMS task force to implement that plan. In other words, Plaintiff contends that Keely was not assisting the USMS; rather, he and other members of the task force were assisting state authorities with arresting a fugitive subject to state warrants. Importantly, a "joint federal-state system . . . is a model of cooperative federalism, not an agency relationship." *Mays*, 871 F.3d at 447 (opining on the removal statute in a case involving the MDEQ and the EPA).

Plaintiff's argument misses the mark because, even if the USMS task force was assisting or cooperating with state officials, Keely was assisting the USMS task force. And that task force was acting in accordance with its own mandate to execute selected state and federal warrants. It had accepted the warrants for Sterling's arrest, ostensibly because Sterling's case satisfied its own criteria. Moreover, Plaintiff's witnesses clarified that the state officers could not command or control Keely or the USMS task force. They could only provide general direction to and request assistance from the USMS task force officers. Thus, the federal government, which operated independently from the state, acted as Keely's superior, which means Keely acted under a federal officer.

*Acts Under Color of Federal Office*. To demonstrate that the acts at issue were performed under color of federal office, Keely must show a "causal connection" between "the charged conduct and asserted official authority." *See Willingham v. Morgan*, 395 U.S. 402, 409 (1969). Keely has made that showing. The USMS gave him authority to execute arrest warrants accepted by the USMS task force and that is what he was attempting to do when he struck Sterling with his

vehicle.  Put another way, even if Keely's employment by the MSP gave him authority to arrest Sterling, he was not exercising that authority on April 17, 2024.  He was at the scene solely because he was a member of the USMS task force, which had agreed to execute the warrants for Sterling's arrest, and which gave Keely the resources to accomplish its mission.

Plaintiff argues that Keely stopped acting under color of federal office when he "intentionally" drove his car toward Sterling and subsequently struck and killed him.  (Pls.' Resp. Br. 15.)  Plaintiff apparently argues that a negligent or intentionally criminal act cannot be performed under color of a federal office.

The Court disagrees.  As discussed above, Keely was acting solely in his capacity as a federal task force officer, performing a task given to him by a federal superior, within the scope of his federal office.  If allegations of criminal conduct could remove an act from the color of federal office, then the removal statute for criminal prosecutions would never apply.

In support of its argument, Plaintiff cites cases that are not binding or persuasive.  In *Fink v. Gerrish*, 149 F. Supp. 915 (S.D.N.Y. 1957), a district court held that two immigration officers in a government-owned vehicle did not act under color of their federal offices when they negligently ran down a pedestrian.  *Id.* at 917.  The court concluded that "it does not follow nor is it claimed that the negligent operation" of a vehicle was done "under color of their office as immigration officers." *Id.*  Similarly, in *Christiansen v. Witte*, 175 F Supp. 759 (D. Or. 1959), a district court held that a postal worker who negligently crashed into another vehicle while delivering mail could not claim the benefit of the removal statute because his conduct did not fall within the definition of acts under color of federal office. *Id.* at 761.

The logic in *Fink* and *Christiansen* is not persuasive and is not applicable to Keely.  He was not merely performing the incidental duties of a deputized USMS task force officer; rather,

11

he was attempting to execute an arrest warrant under authority expressly provided by the USMS. Indeed, the removal statute expressly extends to acts under color of federal office "*or* on account of any right, title or authority claimed under any Act of Congress for the apprehension . . . of criminals[.]" 28 U.S.C. § 1442(a)(1) (emphasis added). Keely's conduct and circumstances fit that definition.

*Colorable Federal Defense*.  Keely has a colorable federal defense of immunity under the Supremacy Clause, which applies when "(1) the federal agent was performing an act which he was authorized to do by the law of the United States and (2) in performing that authorized act, the federal agent did no more than what was necessary and proper for him to do." *Kentucky v. Long*, 837 F.2d 727, 744 (6th Cir. 1988).  "[A] mistake in judgment or a 'botched operation,' so to speak, will not of itself subject a federal agent to state court prosecution." *Id.* at 745.  The question is whether the federal officer "employed means which he could consider reasonable in the discharge of his duty."  *Id.*  The "necessary and proper" test contains both an objective and subjective component. *Id.* "On the subjective side, the agent must have an honest belief that his action was justified.  On the objective side, his belief must be reasonable."[2]  *Id.*

Keely claims that he was attempting to protect others by stopping a fleeing suspect with a history of violence who officers believed was dangerous and could be armed.  He contends that he did not intend to strike Sterling; rather, his vehicle slid at the last moment and skidded into the wall.  More evidence is necessary to adjudicate Keely's defense, but it is certainly a colorable one.

---

[2] Procedurally, the Court of Appeals directs courts to resolve the question of federal immunity early in the proceedings "in order to avoid requiring a federal officer to run the gauntlet of standing trial and having to wait until later to have the issue decided."  *Long,* 837 F.2d at 752.

In summary, Keely has met his burden of satisfying all the elements necessary for removal under § 1442.

### C. Abstention

Plaintiff argues that this Court should abstain from removing the case against Keely under the doctrine in *Younger v. Harris*, 401 U.S. 37 (1971). A court can abstain under *Younger* where "there are state proceedings that are (1) currently pending; (2) involve an important state interest; and (3) will provide the federal plaintiff with an opportunity to raise his or her constitutional claims." *Nimer v. Litchfield Twp. Bd. of Trs.*, 707 F.3d 699, 701 (6th Cir. 2013). Plaintiff argues that the State of Michigan has a compelling interest in protecting its citizens from excessive force by law enforcement officers and that Keely can litigate any federal defense in state court proceedings.

The Court declines to abstain under the *Younger* doctrine. The purpose of that doctrine is to prevent "federal interference with state criminal prosecutions," as when a federal court issues an injunction preventing the state prosecution from proceeding. *See Younger*, 401 U.S. at 46. There is no risk of such interference here. Keely's notice of removal does not seek to halt or hinder his criminal proceedings; instead, it asks the Court to transfer those proceedings to a different forum. The State of Michigan can vindicate its interests by proceeding in this Court.

Furthermore, Keely relies on a statutory right to remove his case to this Court. Plaintiff asks the Court to negate that right under a court-created abstention doctrine. The Court is not persuaded that it can or should use a court-created doctrine to deny Keely his rights under a federal statute. Indeed, Plaintiff cites no case in which a court relied on *Younger* to reject removal under § 1442. Thus, *Younger* abstention is not warranted.

## IV. CONCLUSION

In summary, the Court will accept removal of the case to federal court under § 1442 and order the state court to proceed no further.

An order will enter consistent with this Opinion.

Dated: August 26, 2024        /s/ Hala Y. Jarbou
                              HALA Y. JARBOU
                              CHIEF UNITED STATES DISTRICT JUDGE